## In re ESTATE OF PULFORD.

[Cite as *In re Estate of Pulford* (1997), 122 Ohio App.3d 92.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

No. 96–G–2002.

Decided July 28, 1997.

*John P. O'Donnell*, for appellant Ashley Pulford.

*William C. Hofstetter*, for appellee, administrator William C. Hofstetter.

FORD, Presiding Judge.

This is an appeal from the Geauga County Court of Common Pleas, Probate Division. Appellant, Ashley Pulford, putative father, appeals from an order determining that he was not legally entitled to share in the proceeds from any wrongful death distribution emanating from the death of decedent Kevin Pulford, he was not entitled to anything from decedent's estate, and his name was to be stricken from the form listing decedent's next of kin, legatees, and devisees.[1]

On January 29, 1996, decedent, born October 19, 1995, was traveling with his mother, Adrea Bontrager, and grandmother in an automobile. Decedent was sitting in a child restraint seat and began to cry. Bontrager removed decedent from the child restraint seat and held him in her lap. The vehicle was then involved in an accident that resulted in decedent's death. Decedent died intestate.

On March 28, 1996, Bontrager filed her application for authority to administer decedent's estate. That same day, she filed a list of decedent's survivors, including appellant, the purported father of decedent, who would be entitled to inherit under the statute of descent and distribution. On April 19, 1996, Bontrager filed a motion to remove appellant's name from the next-of-kin form, since, as stipulated by the parties, appellant failed to satisfy the legal prerequisites to be named the legal father of decedent. In a motion filed on May 21, 1996, appellant requested that Bontrager be removed as administrator of decedent's estate.[2] In a judgment entry dated July 24, 1996, the court below overruled Bontrager's application to administer decedent's estate because she had potential conflicts that precluded her from being a qualified applicant. Although both

---

1. The companion case to the instant appeal, *In re Pulford* (1997), 122 Ohio App.3d 88, 701 N.E.2d 55, concerned the application of decedent's mother to administer decedent's estate.

2. Although appellant moved the court to remove Bontrager as administrator, the probate court treated the motion as an objection to the appointment, because Bontrager was never appointed administrator.

appellant and Bontrager testified that appellant was decedent's father, the probate court held that since appellant had failed to take the necessary steps to be recognized as the legal father of decedent, his name should be removed from the next-of-kin form. Furthermore, the court held that appellant could not share in the proceeds from any wrongful death action triggered by decedent's death and that appellant could not receive any distribution from decedent's estate. The court appointed appellee, William C. Hofstetter, to serve as the administrator of decedent's estate.

From this judgment entry, appellant asserts the following assignments of error:

"[1.] The trial court erred when it granted Adrea Bontrager's motion to amend the next-of-kin form.

"[2.] The trial court erred when it determined that [appellant] was not entitled to participate in any wrongful death distribution since that issue was not properly before the court."

Since appellee argues that the judgment entry in this matter is not a final appealable order, we will address that issue before proceeding to the merits of appellant's appeal. R.C. 2505.02 provides that "an order that affects a substantial right made in a special proceeding" is a final appealable order. The Supreme Court of Ohio has held:

"Orders that are entered in actions that were recognized at common law or in equity and were not specially created by statute are not orders entered in special proceedings pursuant to R.C. 2505.02." (Citation omitted.) *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 616 N.E.2d 213, syllabus.

In an attempt to clarify the *Polikoff* syllabus, the Supreme Court of Ohio has stated that "[u]nder *Polikoff*, it is the underlying *action* that must be examined to determine whether an order was entered in a special proceeding." (Emphasis *sic.*) *Walters v. The Enrichment Ctr. of Wishing Well, Inc.* (1997), 78 Ohio St.3d 118, 121–122, 676 N.E.2d 890, 893–894.

In the present case, there are two separate actions involved in the court's order that require analysis under *Polikoff*. The first action relates to appellant's first assignment of error, in which appellant argues that the trial court erred in determining that appellant could not share in any distribution from decedent's estate. In determining whether this order is final and appealable, our inquiry is whether the procedure for determining a decedent's next of kin was recognized at common law or in equity. *Polikoff*.[3]

---

3. The difficulties in applying the *Polikoff* test are serious and well documented. *In re Pulford*, cited in fn. 1 *supra*. *In re Myers* (1995), 107 Ohio App.3d 489, 490–491, 669 N.E.2d 53, 53–54, fn. 1.

██ "The 'common law' is all the statutory and case law background of England and the American colonies before the American revolution. \* \* \* " Black's Law Dictionary (6 Ed.1990) 276. The Supreme Court of the United States has stated that Blackstone's Commentaries is the most reliable source on the common law of England. *Schick v. United States* (1904), 195 U.S. 65, 69, 24 S.Ct. 826, 827, 49 L.Ed. 99. Blackstone recognized that at common law, a decedent's next of kin was determined by calculating a person's degree of consanguinity to the decedent. Blackstone' Commentaries on the Law (Gavit Ed.1941) 358.

Furthermore, although some aspects of estate administration were within the jurisdiction of the ecclesiastical courts of England, some of the issues were resolved in that country's common-law courts. A leading text has stated:

"Jurisdiction over decedents' estates was divided between the common law courts and the ecclesiastical courts. The common law courts, a part of the royal judicial system, decided cases involving the distribution and use of real property. The ecclesiastical courts, a part of the judicial system of the Roman Catholic Church, decided cases involving the distribution and use of personal property. \* \* \* " (Footnote omitted.) Ritchie, Alford, Effland & Dobris, Cases and Materials on Decedents' Estates and Trusts (1993) 6. See, also, Simes & Basye, The Organization of the Probate Court in America: I (1944), 42 Mich.L.Rev. 965, 968.

Those facets of estate administration not within the jurisdiction of the ecclesiastical courts were within the authority of either the common-law courts or the chancery courts. Simes at 967. Thus, the administration of estates was not conducted solely in ecclesiastical courts, but rather occurred in both the common-law courts and courts of equity in England. Therefore, to declare that estate administration is not a part of the English common law would require an erroneously narrow definition of the common law. Consequently, the administration of decedents' estates was recognized at common law and in equity.

Since the procedure for determining a decedent's next of kin was recognized at common law, the process is not a special proceeding under the *Polikoff* definition. Therefore, the order striking appellant's name from the next-of-kin form was not a final appealable order. Accordingly, appellant's first assignment of error is dismissed for lack of a final appealable order.

██ In the second assignment of error, appellant argues that the trial court erred in finding that appellant was not legally entitled to share in any wrongful death distribution brought as a result of decedent's death. Again, before reaching the merits of this assignment, we are compelled to address the question of whether this holding is a final appealable order ripe for appellate review.

Unlike the procedure for determining the next of kin, the wrongful death action was statutorily created in Ohio in 1851 and was not recognized at common law. *Sabol v. Pekoc* (1947), 148 Ohio St. 545, 551–552, 36 O.O. 182, 184–185, 76 N.E.2d 84, 87–88; McCormac, Wrongful Death in Ohio (1982) 1, Section 1.01. Therefore, the probate court's order that appellant was not entitled to any wrongful death distribution is also an order made in a special proceeding.

■■ Our next inquiry is whether the order stating that appellant could not share in the proceeds from a wrongful death action affected a substantial right of appellant. R.C. 2505.02. The Supreme Court of Ohio has held that "[a]n order which affects a substantial right has been perceived to be one which, if not immediately appealable, would foreclose appropriate relief in the future." *Bell v. Mt. Sinai Med. Ctr.* (1993), 67 Ohio St.3d 60, 63, 616 N.E.2d 181, 184.

In the present case, appellant's right to share in the proceeds from the wrongful death action depends entirely upon his name being included among the next of kin so that he would be a potential beneficiary of the action. Without being listed as a beneficiary on the next-of-kin form, appellant would not be entitled to notice of the settlement of the wrongful death claim, and would have no further opportunity to share in the wrongful death proceeds. McCormac at 155–156, Section 10.03. Therefore, the order striking appellant's name from the next-of-kin form affects a substantial right of appellant. Consequently, that portion of the order is final and appealable.

■ In the second assignment of error, appellant argues that the probate court erred in concluding that appellant was not entitled to share in the proceeds of a wrongful death action resulting from decedent's death. Appellant basically relies upon R.C. 3111.03, which sets forth the circumstances under which a man is presumed to be the natural father of a child. Appellant argues that the policy behind R.C. 3111.03 is to avoid fraud by potential heirs and that this policy is not served by rigidly applying statutory paternity requirements in the present case because both Bontrager and appellant testified that appellant was decedent's natural father.

In *Ginter v. Woodell* (May 17, 1988), Clark App. No. 2392, unreported, 1988 WL 53919, the Second District Court of Appeals addressed a similar issue. In *Ginter*, the mother, who was in her seventh month of pregnancy, was killed in an automobile accident, and the child was stillborn. The mother and putative father were not married. When the administrator of the decedent's estate sought approval for settlement of the mother's wrongful death settlement, the probate court determined that the father had not established a parental relationship for purposes of receiving wrongful death proceeds. The court of appeals affirmed and stated:

"We agree with the trial court that the word 'parent' as used in R.C. 2125.02 contemplates that a legal parent-child relationship had existed at the time of the wrongful death of the child. Since the [putative father] failed to demonstrate that such a legal relationship existed between [the child] and himself, the court properly denied [the putative father's] right to participate in the wrongful death proceeds. * * * " *Id.* at 3.

However, the Supreme Court of Ohio has recently held:

"A child born out of wedlock is not foreclosed from recovering damages for the wrongful death of his or her putative father, simply because paternity had not been acknowledged, adjudicated or otherwise established during the putative father's lifetime. Paternity may be established after the death of the decedent in order to permit an illegitimate child recovery under the Wrongful Death Act for the wrongful death of his or her father." *Brookbank v. Gray* (1996), 74 Ohio St.3d 279, 658 N.E.2d 724, paragraph two of the syllabus.

The *Brookbank* court also stated that "[t]he term 'children,' as used in R.C. 2125.02(A)(1), includes all natural or adopted children, *whether legitimate, legitimated, acknowledged or illegitimate.*" (Emphasis added.) *Id.* at paragraph one of the syllabus.

Thus, *Brookbank* emphatically rejected *Ginter*'s reliance upon the technical distinction between establishing the parent-child relationship before or after the putative father's death. Therefore, although *Brookbank* addressed the rights of an illegitimate child to receive a distribution from wrongful death proceeds stemming from the father's death, we find that its rationale is applicable to the case at bar.

In the present case, appellant admits that he failed to satisfy the technical requirements to establish a parent-child relationship. However, after decedent's death, both appellant and decedent's mother, Bontrager, testified that appellant was decedent's natural father. Additionally, it is uncontroverted that appellant and Bontrager were the natural parents of three other children. Furthermore, appellant, acting on the assumption that he was decedent's father, visited decedent several times before decedent's death. Therefore, pursuant to the Supreme Court of Ohio's reasoning in *Brookbank*, we hold that a father who has failed to legally establish a parent-child relationship during the child's lifetime may receive a distribution from the wrongful death proceeds awarded as a result of his child's death when there is no controversy concerning the father's paternity.

Therefore, the probate court erred in holding that appellant was not legally entitled to receive wrongful death proceeds awarded as a result of decedent's death.

For the foregoing reasons, appellant's first assignment of error is dismissed for lack of a final appealable order and appellant's second assignment of error is well taken. The judgment of the Geauga County Court of Common Pleas, Probate Division, is reversed, and this cause is remanded for proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

CHRISTLEY and NADER, JJ., concur.